## AFFIDAVIT IN SUPPORT OF CIVIL COMPLAINT

I, Kevin Lee Mills, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, declare and state:

1.  I have been a Special Agent with the FBI since November 2018. I am currently assigned to the FBI Topeka Resident Agency, Kansas City Division. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offences enumerated in Section 2516 of Title 18, United States Code. I am currently assigned to investigate financial and white collar crime, among other violations of Federal law. As a Special Agent with the FBI, I have participated in and conducted several investigations of violations of various Federal and State criminal laws and participated in the preparation and or execution of search, arrest, and seizure warrants, all in violation of Title 18, United States Code. I have received training regarding the investigation of fraud schemes that involve the use of computers, cellular phones, and electronically stored evidence. I am a graduate of the FBI Basic Field Training Academy in Quantico, Virginia.

2.  The information contained in this affidavit is based on my personal knowledge and observation, and/or through information conveyed to me by others involved in this investigation, and my review of records, documents, and other evidence obtained during the investigation.

3.  This affidavit is submitted in support of a civil forfeiture complaint for the following property:

    a.  The contents of account number xxxxxx1736, styled as William B. Whymark, located at TD Bank, 1006 Astoria Boulevard, Cherry Hill, New Jersey

1

08003, in the approximate amount of $164,599.92;

  b. The contents of account number xxxxxx3625, styled as William Whymark and Jessica Whymark, located at Citibank, 5800 South Corporate Place, Sioux Falls, South Dakota 57108, in the approximate amount of $501,173.27; and

  c. The contents of account number xxxxxx3030, styled as WMK Technology Corp, located at Citibank, 5800 South Corporate Place, Sioux Falls, South Dakota 57108, in the approximate amount of $37,537.94.

## BACKGROUND

Individuals and Entities

  4. Saint Francis Ministries (SFM), with corporate headquarters in Salina, Kansas, is a 501c(3) faith-based organization that provides foster care and social services in the states of Kansas, Arkansas, Mississippi, Nebraska, Oklahoma, and Texas. During 2017 – 2021, SFM contracted with the State of Kansas through the Kansas Department of Children and Family Services (KDCF) to provide foster care, adoption, family preservation and behavioral health services. I interviewed KDCF personnel and confirmed that SFM received funding from the United States Department of Health and Humans Services (HHS), Social Services Block Grant (SSBG) to include Temporary Assistance for Needy Families (TANF) grants and funding from Title IV-E and IV-B of the Social Security Act.

  5. On May 13, 2014, The Very Reverend Robert N. Smith was hired as the Chief Executive Officer (CEO) of SFM.

  6. Doctor William B. Whymark is the CEO and President of WMK Research Inc. (WMK). WMK was incorporated in the State of New York on January 22, 2013. The listed address of the registered agent was 487 East Main Street, Suite #119, Mount Kisco, New York

10549. No registered agent was specified.

7. QubeRoot Analytics LLP. (QubeRoot) is a technology company based in Bangalore, India. Surendher Nagaraj is the President of QubeRoot. Whymark hired QubeRoot as a sub-contractor for WMK to provide services for SFM.

8. Nagaraj identified Pinnacle Seven Technologies (Pinnacle), a technology company in India, as a company who Whymark also uses as a sub-contractor for WMK to provide services for SFM.

9. During the course of this investigation, I discovered that Whymark engaged in a scheme to defraud SFM by submitting fraudulent invoices to SFM through his company, WMK, for information technology (IT) services. Chiefly, Whymark's scheme to defraud included the submission of fraudulent invoices claiming that personnel had performed work for SFM when according to QubeRoot and Pinnacle records, they did not. Whymark's scheme to defraud ultimately caused SFM to pay Whymark, through WMK, over $10,000,000.00.

## THE INVESTIGATION

SFM Hires William Whymark as Chief Information Officer (CIO)

10. On January 5, 2018, SFM signed a Retention Agreement (agreement) with Whymark as a "vendor". This agreement stated that Whymark would receive a lump sum payment in the gross amount of 10% of cost savings in SFM's IT department over the two-year period relative to what was paid at contract start. The agreement further stated that Whymark would also receive a yearly salary of $164,000. The agreement was signed by Smith and Whymark. The investigation identified that Whymark, as SFM CIO, reported directly to Smith.

11. In February of 2018, Smith introduced Whymark to SFM's Board of Directors as SFM's CIO. Whymark continued to serve as the President of WMK while concurrently serving

as SFM's CIO. I reviewed the Board of Directors meeting minutes which did not include any mention of WMK, or the fact that Whymark was currently the CEO of WMK.

WMK Agreement with SFM

12.     On January 5, 2018, WMK and SFM entered into a Master Services Agreement (MS Agreement) whereby WMK, as contractor, would provide SFM services related to "Data Sciences and Information Technology." This contract included a schedule of employee hourly and weekly fees, and an estimate of a monthly payment to Amazon for IT services. No overall cost estimates or projections were identified. The contract was signed by Smith, on behalf of SFM, and Whymark, on behalf of WMK.

13.     A Statement of Work (SOW) accompanied the MS agreement which provided further details of the contract. The SOW claimed twenty-two personnel, including Whymark, would be dedicated to the MS Agreement. A timeline detailed that the initial work would begin on November 7, 2017 and conclude on May 24, 2018. The SOW did not include an estimate of the total cost of the MS agreement.

14.     Greg Meissen, Chair of SFM's Board of Directors, stated the Board of Directors became aware of the existence of SFM's contract with WMK only after allegations of misconduct had been communicated in an internal whistleblower complaint to the Board. Meissen advised the Board of Directors first became aware of how much money SFM paid to WMK during a subsequent internal investigation. Meissen advised that WMK was awarded the MS Agreement by Smith.

15.     The SFM Board of Directors meeting minutes for 2018 do not reflect any record of Smith asking permission, proposing, or informing the Board of his decision to award any contract to WMK.

WMK Subcontractors

16. The investigation identified that Whymark subcontracted the data science and IT support services portion of the SFM contract to QubeRoot. QubeRoot did not perform any other work for any other entity while subcontracting with WMK on the SFM project.

17. Nagaraj advised he provided Whymark with a QubeRoot employee roster via email quarterly. The roster included employee names and positions. Nagaraj also provided Whymark with monthly invoices via email that indicated which individuals worked by position, hours worked, and the employee's hourly wage.

18. Nagaraj further advised that Whymark requested that QubeRoot be responsible for the creation of new software for SFM. Nagaraj told Whymark he was not a software developer and identified Pinnacle as a company who could perform the requested software development work.

19. Nagaraj advised that Arun Jesuraj, co-founder of Pinnacle, submitted monthly invoices to Whymark, via email and provided the investigative team with Pinnacle's invoices to WMK for 2018.

WMK Invoices

20. SFM provided the investigative team with all invoices submitted by Whymark on behalf of WMK. Whymark submitted WMK invoices to SFM on a monthly basis via e-mail sent to Smith and/or SFM Finance Department personnel. On some occasions, Whymark submitted multiple invoices in a given month. The investigation identified Smith was responsible for approving WMK invoices, which authorized SFM Finance Department personnel to pay the invoiced amounts to WMK.

5

21. SFM transferred all payments from its account located at a bank in Salina, Kansas to WMK's account number xxxxxx7166, held at Wintrust Bank, located in Chicago, Illinois.

22. My review of these invoices revealed they were generally categorized into personnel expenses, and hardware, software, and travel related expenses. Personnel expenses were generally documented by annotating the names and titles of individuals, their hourly rates, and the number of days they worked during the invoiced period. Some invoices included personnel expenses annotated as only, "team cost" which did not specify individual names and titles, nor hourly rates.

### Whymark's Scheme to Defraud through WMK Invoice Submissions

23. The investigation identified that between the approximate time period of January 2018 through July 2021, Whymark, through WMK, submitted false and fraudulent invoices to SFM, pursuant to its MS agreement with SFM. The invoices misrepresented personnel who had worked on the MS agreement and their respective titles, inflated the number of days personnel worked and their hourly wages, and claimed that personnel had worked on the contract during the billing period when they had not, or included services performed for which WMK had not been billed.

24. These misrepresentations were specific to the personnel expenses for subcontracted work performed by both QubeRoot and Pinnacle.

25. A review of invoices submitted by QubeRoot to WMK from January 2018 through July 2021 was conducted by the investigative team. As noted on the invoices, and consistent with the MS agreement between WMK and SFM, QubeRoot billed WMK for personnel who performed both data science functions and IT support. The invoices specified the titles of individuals billed for, their hourly rates, and the number of hours worked for the month.

26. A review of invoices submitted by WMK to SFM from January 2018 through July 2021 was also conducted by the investigative team. For the personnel expenses, the invoices specified, for the most part, the names and titles of individuals billed for, their hourly rates, and the number of days worked for the month. In addition, the invoices specified other hardware, software, and travel related expenses.

27. I conducted a comparison of invoices submitted by QubeRoot to WMK and invoices submitted by WMK to SFM for the same billing periods, focusing specifically on personnel expenses. The result of this comparison highlighted the fraudulent misrepresentations Whymark made to SFM.

28. For example, with respect to the invoices for July 1 through July 31, 2019, QubeRoot billed WMK for four individuals for data science support working 20 eight-hour workdays, totaling $9,280. QubeRoot also billed WMK for ten individuals for IT support working 20 eight-hour workdays, totaling $16,640. The total amount of QubeRoot's invoice to WMK for this time frame was $25,920.

29. For the same period as stated in paragraph 29, WMK billed SFM for nine individuals for data science support working 22 eight-hour workdays, totaling $73,040. Individual names were provided. WMK also billed SFM for eleven individuals for IT support working 22 eight-hour workdays, totaling $51,920. The total amount of this invoice specific only to personnel expenses associated with QubeRoot subcontracted services performed was $124,960, a difference of approximately $99,040.

30. The following chart summarizes the difference between the QubeRoot invoices to WMK and WMK invoices to SFM. The total amount invoiced by QubeRoot to WMK for January 2018, through July 2021, is reflected in column A. The total amount WMK invoiced

7

SFM for QubeRoot services for January 2018, through July 2021, is reflected in column B. The difference in amounts invoiced for QubeRoot services by QubeRoot and WMK, respectively, is reflected in column C.

| Year | Column A<br>Quberoot Invoices | Column B<br>WMK Invoices | Column C<br>Invoice Difference |
|---|---|---|---|
| 2018 | $411,232 | $1,169,880 | $758,648 |
| 2019 | $349,400 | $1,482,213 | $1,132,813 |
| 2020 | $328,320 | $859,244 | $530,924 |
| 2021 (Jan – July) | $95,040 | $246,525 | $151,485 |
| Total | $1,178,992 | $3,757,862 | $2,573,870 |

31. Payments made from WMK's account number xxxxxx7166, to QubeRoot from January 2018 through June 2021, totaled approximately $1,154,010.

32. I conducted a review of invoices submitted by Pinnacle to WMK from January 2018 through November 2018. As noted on the invoices, and consistent with the MS Agreement between WMK and SFM, Pinnacle billed for personnel who worked on the development of software to be used by SFM. The invoices specified the titles of individuals billed for, their hourly rates, and the number of hours worked for the month.

33. A review of invoices submitted by WMK to SFM from January 2018 through November 2018, was also conducted by the investigative team. Personnel expenses were specified, for the most part, by annotating the names and titles of individuals billed for, their hourly rates, and the number of days worked for the month. In addition, the invoices specified other hardware, software, and travel related expenses.

34. A comparison was then conducted between invoices submitted by Pinnacle to WMK with the related invoices submitted by WMK to SFM for the same billing periods, focusing specifically on personnel expenses. The result of this comparison highlighted the misrepresentations made by Whymark.

35.     For example, for November 1, 2018, through November 30, 2018, Pinnacle billed WMK for 11 unidentified individuals for software development, with all individuals having worked 20 eight-hour workdays, totaling $23,680. Conversely, for software development, WMK billed SFM for 12 individuals whose names were provided, each having worked 22 eight-hour workdays, plus an additional two "teams" who worked for 22 eight-hour workdays. The total amount of this invoice specific to personnel expense associated with the Pinnacle subcontracted services performed was $146,862, a difference of approximately $123,182.

36.     The following chart summarizes the difference between the Pinnacle invoices to WMK and the WMK invoices to SFM.  The total amount invoiced by Pinnacle to WMK for January 2018 through November 2018, is reflected in column A. The total amount WMK invoiced SFM for Pinnacle services for January 2018 through November 2018, is reflected in column B. The difference in amounts invoiced for Pinnacle services by Pinnacle and WMK, respectively, is reflected in column C.

| Time Period | Column A<br>Pinnacle Seven Invoices | Column B<br>WMK Invoices | Column C<br>Invoice Difference |
|---|---|---|---|
| 2018 (Jan. – Nov.) | $245,948 | $1,271,062 | $1,025,114 |

37.     Payments made by Whymark from WMK's account number xxxxxx7166, to Pinnacle from January 2018 through December 2018 totaled approximately $253,852.

38.     From January 2018 to June 2021, WMK received sixty-five payments from SFM totaling approximately $10,737,583 into WMK's account number xxxxxx7166. Whymark received these funds through the submission of false and fraudulent invoices to SFM, pursuant to its MS Agreement, that misrepresented the number of personnel who had worked and their respective titles, inflated the number of days personnel worked and their hourly wages, and claimed that personnel had worked on the contract during the billing period when they had not,

9

or for which WMK had not been billed.

Purchase of 9 Terrace Circle, Armonk, NY

39.     On August 26, 2019, Whymark purchased a residence located at 9 Terrace Circle, Armonk, New York, for $3.75 million. Whymark and Jessica Whymark obtained a $2.472 million, 30-year conventional mortgage from Citizens Bank, N.A. The mortgage provided for a 3.125% interest rate that adjusted after year ten. The monthly mortgage payment for the first ten years of the mortgage was approximately $19,479. Whymark paid approximately $1,015,697 at closing, which included approximately $137,336 in closing costs.

40.     The investigation identified that on April 17, 2019, WMK obtained a $500,000 business loan from Wintrust Bank. The loan agreement stated that the "Borrower intends to use the Loan proceeds solely for business or commercially related purposes." The loan was signed for by "William Whymark, President of WMK Research, Inc." On April 26, 2019, the loan proceeds were transferred into Wintrust Bank account number xxxxxx7166. The account had an existing balance of approximately $60,341 when the loan proceeds were deposited.

41.     On April 26, 2019, $475,000 was transferred from Wintrust Bank account number xxxxxx7166 into Wintrust account number xxxxxx0942, which was styled as William Whymark and Jessica Whymark. Account xxxxxx0942 had an existing balance of approximately $571,018 when the $475,000 was deposited. On April 30, 2019, $375,000 was transferred from Wintrust Bank account number xxxxxx0942 into Wintrust Bank account number xxxxxx6011, which was styled as William Whymark and Jessica Whymark. Account xxxxxx6011 had an existing balance of approximately $41.00 when the $375,000 was deposited.

42.     On April 30, 2019, check number 2231, dated April 26, 2019, payable to "David M. Gladstone as Attorney," in the amount of $375,000, having "9 Terrace Circle Armonk Down

Payment" written on the memo line and signed by "William B. Whymark" cleared Wintrust Bank account number xxxxxx6011.

43. On April 22, 2019, a Home Equity Line of Credit (HELOC) was obtained from Citizens Bank N.A. in the amount of $527,500. The HELOC was disbursed into account xxxx0455 on May 3, 2019. On May 3, 2019, a check was written from account xxxx0455 in the amount of $527,500. That same day, the check was deposited into account xxxx0942 in the name of William Whymark, held at Wintrust Bank.

44. On August 23, 2019, both $1,042,113 and $10,000 were electronically transferred separately from Wintrust Bank account number xxxxxx7166 into Wintrust Bank account number xxxxxx6011. Account xxxxxx6011 had an existing balance of approximately $579 when the $1,042,113 and $10,000 were transferred. On August 23, 2019, $1,052,113 was electronically transferred from Wintrust Bank account number xxxxxx6011 to an account styled as "David M. Gladstone, P.C.," located at JP Morgan Chase.

45. Records from Citizens Bank indicated that the monthly payments on the Citizens Bank mortgage for the purchase of 9 Terrace Circle, Armonk, New York, were paid from Citizens Bank account number xxxxxx0455, styled as William Whymark. Between September 17, 2019, and January 15, 2021, twelve payments totaling approximately $309,940 were paid on the outstanding mortgage. Bank records indicated that the funds used to make the monthly mortgage payments were transferred, via wire transfer, into Citizens Bank account number xxxxxx0455 from Wintrust Bank account number xxxxxx7166. Between September 17, 2019, and January 15, 2021, thirteen wire transfers totaling approximately $314,820 were made from Wintrust Bank account number xxxxxx7166 into Citizens Bank account number xxxxxx0455.

46. A summary of the total amount of funds traced to purchase the residence at 9

Terrace Circle, Armonk, New York, from accounts controlled by Whymark, as noted herein, is as follows:

| $375,000 | Check drawn on Wintrust Bank account number xxxxxx6011 payable to David M. Gladstone ("down payment") |
|---|---|
| $1,052,113 | Wire transfers from Wintrust Bank account number xxxxxx6011 to David M. Gladstone |
| $309,940 | Mortgage payments to Citizens Bank from Citizens Bank account number xxxxxx0455 |
| $1,737,052 | Total funds paid toward purchase of 9 Terrace Circle, Armonk, New York |

Sale of 9 Terrace Circle, Armonk, NY

47.     On or about November 23, 2021, according to records maintained by Westchester County, for the State of New York, William Whymark and Jessica Arcanjo Barao, also known as Jessica Whymark, sold the residence located at 9 Terrace Circle, Armonk, New York, for $4,000,000.

48.     Records obtained from the closing file associated with the sale of 9 Terrace Circle, Armonk, New York, indicated mortgage #0032076358, in the name of William and Jessica Whymark, held at Citizens Bank, was paid off via a wire transfer in the amount of $2,543,462.80 on November 23, 2021.

49.     Records from TD Bank 1006 Astoria Boulevard, Cherry Hill, New Jersey 08003, indicate that on November 24, 2021, the balance of the proceeds from the sale of 9 Terrace Circle in the amount of $1,197,435.09 was deposited into TD Bank account xxxxxx1736, which was styled as William Whymark. Records further indicate that the balance of account xxxxxx1736 as of February 2, 2022, was $139,625.11.

50.     Records from Citibank, 5800 South Corporate Place, Sioux Falls, South Dakota 57108, indicate that on November 24, 2021, $900,000 was transferred in one transaction from TD Bank account xxxxxx1736, which was styled as William Whymark, to Citibank money

market savings account, account number xxxxxx3625, styled as William Whymark and Jessica Whymark. Records further indicate that the balance of account 6873283625 as of January 31, 2022, was $500,173.27.

51. Records from Citibank, 5800 South Corporate Place, Sioux Falls, South Dakota 57108, indicate that on December 7, 2021, $75,000.00 was transferred in one transaction from Citibank money market savings account, account number xxxxxx3625, styled as William Whymark and Jessica Whymark, to Citibank checking account, account number xxxxxx3030, styled as WMK Technology Corp. Records further indicate that the balance of account xxxxxx3030 as of January 10, 2022, was $44,789.94.

52. On February 4, 2022, the contents of Citibank account numbers xxxxxx3625 and xxxxxx3030 were seized. The amount of funds seized was $500,173.27 and $37,537.94, respectively.

53. On February 4, 2022, the contents of TD Bank account# xxxxxx1736 was seized. The amount of funds seized was $164,599.92.

## CONCLUSION

54. Based on the foregoing, I have probable cause to believe that William Whymark, personally and through WMK, created and implemented a scheme to defraud SFM of approximately $10,737,583 in violation of 18 U.S.C. § 1343 (wire fraud).

55. As detailed above, proceeds from the scheme to defraud and wire fraud violations were traced from SFM's account at Intrust Bank, Salina, Kansas, through WMK Research, Inc. account xxxxxx7166 at Wintrust Bank. These funds were then used to purchase the real property located at 9 Terrace Circle and make mortgage payments. Once 9 Terrace Circle was sold on November 23, 2021, proceeds from the sale which represent traceable proceeds from the scheme

to defraud and wire fraud violations were traced to William and Jessica Whymark's account xxxxxx1736 at TD Bank. As a result, I have probable to cause to believe that the funds in TD Bank account xxxxxx1736 are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

56. Further, as detailed above, some of the traceable fraud proceeds from the sale of 9 Terrace Circle were withdrawn from the TD Bank account xxxxxx1736 and were deposited into the account of William and Jessica Whymark, account number xxxxxx3625, located at Citibank. Some of these funds were further transferred to the account of William Whymark, account number xxxxxx3030. As a result, I have probable to cause to believe that the funds in Citibank account xxxxxx3625 and Citibank account xxxxxx3030 are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

57. Based upon the foregoing, I also have probable cause to believe that monetary transactions in violation of 18 U.S.C. §1957 have occurred, specifically:

    a. On November 24, 2021, proceeds traceable from the wire fraud violations were transferred into TD Bank account xxxxxx1736 in the amount of $1,197,435.09;

    b. On November 24, 2021, proceeds traceable from the wire fraud violations were transferred from TD Bank account xxxxxx1736 in the amount of $900,000 into Citibank account xxxxxx3625.

    c. On December 7, 2021, proceeds traceable from the wire fraud violations were transferred from Citibank account xxxxxx3625 in the amount of $75,000 into Citibank account xxxxxx3030.

58. Because the contents of TD Bank account xxxxxx1736 and Citibank accounts xxxxxx3625 and xxxxxx3030 were involved in violations of 18 U.S.C. § 1957, the contents of these three accounts are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

_____
KEVIN LEE MILLS
Special Agent
Federal Bureau of Investigations

Subscribed and sworn before me this 29th day of July, 2022.

SUSAN M. OBREGON
Notary Public - State of Kansas
My Appt. Expires June 6, 2023

_____
Notary Public

My Commission Expires: June 6, 2023

15